**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

AFM:EHS
F. #2019R00476

October 22, 2026

By ECF

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Artem Stryzhak
Criminal Docket No. 23-324 (PKC)
Criminal Docket No. 25-381 (PKC)

Dear Judge Chen:

The government respectfully submits this letter in advance of defendant Artem Stryzhak's sentencing, which is scheduled for October 27, 2026. On December 19, 2025, the defendant pleaded guilty to two counts of conspiracy to commit fraud and related activity in connection with computers, for his role in a series of international ransomware attacks.[1] The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") and the relevant statutory maximum is effectively 108 to 120 months' imprisonment.[2] As explained below, the government respectfully recommends a sentence within the Guidelines range calculated in the plea agreement—to wit, 87 to 108 months' imprisonment.

[1] *United States v. Stryzhak*, 25-cr-381 (PKC), was transferred to the Eastern District of New York from the Middle District of Florida pursuant to Rule 20 of the Federal Rules of Criminal Procedure.

[2] The Guidelines range is 108 to 135 months' imprisonment, but there is a statutory maximum sentence of 120 months' imprisonment.

## I. Relevant Background[3]

The defendant is a citizen of Ukraine and an international ransomware criminal. Malware is a malicious software program designed to disrupt computer operations, gather sensitive information, gain access to private computers, and take other unauthorized actions on a computer system. Ransomware is a type of malware that infects a computer or computer network and encrypts some or all of the data. Criminals who deploy ransomware typically extort the user of the encrypted computer by demanding that the user pay a ransom to receive a decryption code and recover the data from the encrypted computer.

The defendant perpetrated crimes using at least two ransomware variants, Nefilim and Hive. Both Nefilim and Hive used a ransomware-as-a-service ("RaaS") model featuring administrators, sometimes called developers, and affiliates. RaaS is a subscription-based model where the developers or administrators develop a ransomware strain; create an easy-to-use interface (or "panel") with which to operate it; and then recruit affiliates to deploy the ransomware against victims. Affiliates identified targets and deployed this readymade malicious software to attack victims and then earned a percentage of each successful ransom payment. The defendant was an affiliate of Nefilim and Hive.

### A. The Nefilim Ransomware Scheme

From at least June 2021 to October 2021, in exchange for access to the Nefilim ransomware, the defendant agreed to give 20 percent of the ransom proceeds he received from victim companies to his co-conspirator, Nefilim administrator Volodymyr Tymoshchuk.[4] Tymoshchuk created accounts for affiliates, like Stryzhak, to log in to the ransomware panel, which served as a platform for the affiliates to access the ransomware in order to deploy it against victim companies.

Stryzhak, Tymoshchuk, and others researched companies to hack into, using internet databases to gather information about the victim companies' size and net worth. The bad actors gained initial access to victim networks in various ways, including through use of hacking tools to identify security vulnerabilities, perform brute-force password cracking attacks, and retrieve stored login credentials. At times, they also purchased credentials to victim networks from other criminals. They then used hacking tools to explore the victim networks, obtain long-term access, move laterally (*i.e.*, access other systems within the computer or network) and escalate privileges (*i.e.*, gain greater authority over the computer or network).

After gaining access to the victims' networks, Stryzhak and his co-conspirators stole data from them. They then encrypted the victims' files, so that the victims could not access them. Stryzhak and his co-conspirators typically left ransom notes on the victims' computers stating that their files had been encrypted and that sensitive information had been extracted, and provided email addresses where victims could send encrypted sample files. The Nefilim ransom

[3] Unless otherwise noted, the following facts are taken from the Presentence Investigation Report ("PSR") dated May 1, 2026, and the factual record in this case.

[4] Tymoshchuk remains at large.

notes also typically threatened the victims that unless they came to an agreement with the ransomware actors, the sensitive stolen data would be published on publicly accessible websites, known as "Corporate Leaks" websites, which were maintained by Stryzhak's co-conspirators. After a victim sent two encrypted files, the Nefilim co-conspirators returned the files in decrypted form to prove that they were able decrypt them. Along with the decrypted files, the Nefilim co-conspirators sent further instructions and demands, including a demand for a ransom payment. Victims who paid the ransom typically received a decryption key for the locked data. When victims refused to pay, the co-conspirators published their stolen data on the "Corporate Leaks" sites.

Stryzhak took several overt acts in furtherance of the conspiracy. For example, on or about June 23, 2021, Stryzhak accessed without authorization the network of a victim (referred to in the 23-cr-324 Indictment as "Victim 7"). Stryzhak stole files from Victim 7. On or about June 29, 2021, Stryzhak agreed to create three email accounts to serve as contact addresses for use in a Nefilim ransom note built into a customized Nefilim ransomware executable. On or about July 22, 2021, Stryzhak informed Tymoshchuk that he had network access to several companies, including the victim referenced in the 23-cr-324 (PKC) Indictment as Victim 8. Approximately five hours later, Stryzhak, Tymoshchuk, and other Nefilim co-conspirators attempted to gain unauthorized access to computers used by Victim 8.

The evidence of Stryzhak's knowledge of his criminal activity is substantial. In instant message exchanges between Stryzhak and Tymoshchuk about setting up Stryzhak's access to the Nefilim ransomware panel, Stryzhak acknowledged that the Nefilim panel could be "hacked into by the feds."[5] In addition, on or about June 28, 2021, Stryzhak complimented Tymoshchuk on his criminal activity, sending a link to the Twitter post below, which described Nefilim actors targeting multi-billion-dollar companies. Stryzhak stated: "my compliments )) / you got 10 times more billion dollar companies than REvils))."[6]

---

[5] The communications described herein reflect draft translations from Russian to English.

[6] REvil is a Russia-based ransomware group. The right parenthesis is used in Russian language internet parlance to signify smiling (in effect, acting as the "smiley" emoticon does in English).




B. <u>The Hive Ransomware Scheme</u>

From June 2021 to January 2023, Hive conspirators attacked approximately 1,500 victims worldwide, including government entities, hospitals, and businesses. Hive ransomware attacks caused major disruptions in victims' daily operations around the world and affected responses to the COVID-19 pandemic. In one case, a hospital attacked by Hive ransomware had to resort to analog methods to treat existing patients and was unable to accept new patients immediately following the attack. Hive victims paid more than $100 million in ransoms.

Like Nefilim, Hive actors employed a double-extortion model of attack. Before encrypting the victim system, the affiliate would exfiltrate or steal sensitive data. The affiliate then sought a ransom for both the decryption key necessary to decrypt the victim's system and a promise to not publish the stolen data. Hive actors frequently targeted the most sensitive data in a victim's system to increase the pressure to pay. After a victim paid, affiliates and administrators split the ransom 80/20. Hive published the data of victims who did not pay on the Hive Leak Site.

Records from the Hive backend server reflect that Stryzhak was one of the group's first affiliates, joining on or about June 23, 2021, and working with Hive until the FBI disrupted the group by seizing its servers in January 2023. Working with co-conspirators, including the Hive administrator and others, Stryzhak targeted seven victims, including two law firms, a dentist's office, and a healthcare company during the COVID-19 pandemic. The

evidence from the Hive servers further shows that Stryzhak and his co-conspirators intended to extort more than $2.2 million in ransom payments from his victims.

Stryzhak's actions and communications during the scope of the conspiracy show he had a clear understanding of the Hive ransomware scheme. For example, on or about July 30, 2021, Stryzhak sent an email to a victim, referenced as Victim 6 in the 25-cr-381 Indictment, stating that Victim 6's servers had been hacked and encrypted and demanding a ransom payment. The next day, Stryzhak communicated to the Hive administrator that he had sent Victim 6 an email to prompt them to access the panel and negotiate. Victim 6 told the FBI it had also received a voicemail on or about August 13, 2021, threatening to publicly disclose Victim 6's data. In discussions with the Hive administrator, Stryzhak asked the Hive administrator to demand $600,000 from Victim 6. In December 2021, records from the Hive backend server show Stryzhak discussing with the Hive administrator a victim, referenced in the 25-cr-381 Indictment as Victim 7, and sharing information that the Hive administrator then used to negotiate and make a ransom demand of $200,000.

The government obtained communications between Stryzhak and the Hive administrator spanning the length of the Hive conspiracy. In these communications, Stryzhak asked questions indicating he had access to the Hive panel and could see the negotiations. He also made statements showing that he understood that Victim 6 worked in the healthcare industry, and provided updates on intrusions against additional victims.

Stryzhak's communications reflected a clear understanding of the ransomware scheme and discussed negotiation strategy and means of pressuring victims. He encouraged the Hive administrator to engage in ransom negotiations and eagerly anticipated receiving ransomware payouts. He also referred others to the Hive administrator as potential affiliates.

In sum, Stryzhak demonstrated a clear understanding that he was engaging in and facilitating ransomware activity for his own financial gain.

## II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (*superseded by statute on other grounds*). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-52 (2d Cir.

2015), *as amended* (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (*superseded by statute on other grounds*).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; [and]

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

## III. Analysis

### A. Sentencing Calculation

The Probation Department calculated the defendant's final offense level as 31, as follows:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § § 2B1.1) | | 6 |
| Plus: | Loss of more than $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | 10 or more victims in the conspiracy (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Substantial Part of Scheme Outside U.S. / Sophisticated Means (U.S.S.G. §§ 2B1.1(b)(10)(B)-(C)) | +2 |
| Plus: | Trafficking Unauthorized Access Device (U.S.S.G. § 2B1.1(b)(11)(i)) | +2 |

| | | |
|---|---|---|
| Less: | 0 Criminal History Points (U.S.S.G. § 4C1.1) | -2 |
| Less Acceptance of Responsibility (U.S.S.G. § 3E1.1(a), (b)) | | -3 |
| Total: | | 31 |

Based on a Criminal History Category of I, the defendant's Guidelines range is 108 to 135 months' imprisonment.[7] Because of a statutory maximum, the effective Guidelines range is 108 to 120 months' imprisonment.

B. A Sentence Within the Range in the Plea Agreement Is Appropriate

The government respectfully submits that a sentence of 87 to 108 months is appropriate. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for this sentence.

i. The Nature and Circumstances of The Offense

As an initial matter, the "nature and circumstances of the offense" are serious. Cybercriminals, like the defendant, use sophisticated technologies to prey upon innocent victims worldwide. The defendant and his co-conspirators caused losses of over $100 million in ransom payments and the cost of remedial measures. Beyond financial losses, the disruptions to the victim businesses, which ranged from law firms, to a dentist's office, to a healthcare company during the COVID-19 pandemic, cannot be overstated. In addition to not being able to access their data, these victims also suffer from reputational harm. As Victim 6 in the Hive case noted, "attribution of ransomware attack undermines confidence in a healthcare technology provider." PSR at 13.

These victims were not unsophisticated. As Victim 6 in the Hive case also noted, it is a "steward of sensitive healthcare information . . . [and] maintains robust security, compliance, and incident response programs." And yet, the losses associated with ransomware were extensive. The loss affidavit submitted by Victim 6 is illustrative of the losses incurred by the victim companies: forensic investigations, legal fees, public relations consulting, and for some victims, ransom payments. This does not take into account all of the time and related expenses victim employees lost responding to this incident and/or not being able to access data. There is also the intangible but real harm of sensitive data, including sensitive health data, being in the hands of a bad actor. There can be no question that the harm here is real and that the conduct is serious.

Perhaps acknowledging the fact that they are unlikely to recover damages, only one of the defendant's many victims submitted a loss affidavit. But this victim's loss affidavit serves as an example of the way that the other victim companies were harmed financially and reputationally.

[7] The parties' plea agreement calculated the defendant's Guidelines as 87 to 108 months, but Probation is correct that the loss amounts should be aggregated under § 3D1.3(b) and that the offense Guidelines that produce the highest offense level should apply.

ii. Specific and General Deterrence

There is a need for both specific and general deterrence in this case. As to specific deterrence, the record suggests the defendant's primary motive for committing this crime was greed, though the defendant claims he did not ever receive the promised rewards. A significant sentence is necessary to convey to the defendant that the perceived financial incentive of this criminal activity is outweighed by the significant consequences brought upon those who are caught. If the defendant were to receive a lenient sentence, then he might calculate that the financial rewards are worth the risk, and it is quite possible that he could resume this scheme with contacts who remain at large. Given that Ukraine does not extradite its own nationals to the United States, there is virtually nothing to stop the defendant from resuming his criminal enterprise.

Finally, there is a need for general deterrence. As noted above, in one case (albeit a case in which the government cannot prove this defendant's involvement) a hospital attacked by Hive ransomware had to resort to analog methods to treat existing patients and was unable to accept new patients immediately following the attack. There is real risk to human life caused by hacking hospitals. General deterrence is necessary because ransomware is rampant and difficult to prosecute, as many of the bad actors reside in countries that do not extradite individuals to the United States. A significant sentence will send a powerful message and warn would-be bad actors that participating in ransomware schemes is not worth the cost.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence in the range of 87 to 108 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ ______________________
Alexander F. Mindlin
Ellen H. Sise
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (PKC) (by ECF and E-mail)
Defense Counsel (by ECF and E-mail)